The next case on for argument is United States v. Eng. Okay, we'll keep going. We're almost clear, Mr. Clement. Please. Good morning, Your Honors, and may it please the Court, Paul Clement for the appellant. This case features an unprecedented effort to prosecute a foreign national under Section 666 and the FCPA for bribing U.N. ambassadors to support his effort to build a U.N. convention center for free. The prosecution is unprecedented for a reason. Section 666 does not apply to the United Nations, and the FCPA reaches only official acts and does not extend to pro bono efforts. The centerpiece of this prosecution has always been Section 666. Indeed, the original indictment did not even mention the FCPA. But that statute properly construed does not apply to the United Nations, but reaches only state and local governments and private organizations. That result flows directly from the text and is supported by context, legislative history, and even the U.S. Attorney's Manual. Congress plainly did not use organization in its broadest sense, because otherwise its express coverage of state, local, and tribal government, as well as government agencies, would all be superfluous. These are arguments that are made in your briefs, which we've, of course, reviewed. So to focus you on what may be of concern to us, the government urges that all these references to private organizations is really a shorthand for nongovernmental organizations. Why don't you tell us why you don't think that gets them to a use of Section 666 here? Sure, Your Honor. And I guess what I would say is I think they're wrong about the shorthand, but I also don't think it helps them. I think they're wrong because if you look throughout the U.S. Code, there are plenty of differences between private and public organizations. When Congress wants to be inclusive, they say private and public. I don't see anything that says sort of nongovernmental and governmental or anything like that. So I think this is just a sort of gerrymandered term. They've come up to try to cut out the United Nations, but I don't even think it works. I mean, obviously, I think the reason they don't want it limited to private organizations is because these are public international organizations. So it's clear as day that the United Nations, the IMF, the World Bank are not private organizations. I think it's equally clear that they're not nongovernmental organizations. What they are are multigovernment organizations. They have peacekeeping forces in the case of the United Nations, which makes it seem to me that that is not a nongovernmental entity. Bahel, or I don't know if I'm pronouncing it right, the United States v. Bahel, involves 666. It involved the United Nations. So haven't we implicitly at least already said it applies to the United Nations? No, I don't think you've done it implicitly. Even implicitly, Your Honor, you have had a case that involves 666, applied to the United Nations. The issue that I'm raising and that we've raised throughout this case was not raised in that case at all. It wasn't briefed in that case at all. And, in fact, I think it's fair to say that the case was decided on the assumption that the United Nations was an organization, but just that it wasn't funded in the right way. And that was the only ---- The IMF refers to it as an organization repeatedly throughout the opinion. It does, but not in any way that I think matters. And I think if we're going to look at Bahel, let's look at the whole opinion, because at the end of the opinion, one of the sentencing factors there was for the fact that Bahel was a public official. And there was a dispute in the case about whether he was really a public official because of the status of the United Nations. And this Court in Bahel looked at the sentencing guidelines. And, lo and behold, the sentencing guidelines say that you're a public official if you work at a public international organization. And that's in contradistinction from commercial bribery enhancement, which is a different enhancement, which applies in private sector cases. So there's yet another indication in the sentencing guidelines that public international organizations are on the governmental side of the line. And I think it's important, Your Honors, to understand that you don't have to look far for the model of a statute that expressly covers public international organizations. The FCPA is such a statute. It does it the way you would expect it to do, which it takes these entities, which are somewhat unique, and makes the coverage of them explicit. It cross-references the definition of public international organizations in the IOIA. And it does all that very clearly. And then it does something else that I think is very important and wouldn't make any sense if the government's right, which is for purposes of the FCPA, it's passed in 1977. In 1984, Section 666 is enacted. And then in 1998, for the first time, Congress extends the FCPA to public international organizations. And in doing so, it creates a situation where the official of the public international organization, the bribee, if you will, can never be the criminal defendant. In thinking about that part of your argument, the question that occurs to me is these statutes have very different purposes. It seems that the FCPA is part of being a good international citizen, preventing bribery of other countries' foreign officials or organizations or whatever. 666, however, seems to be intended to protect the public fisc. The United States is contributing money to these either state or local governments or to organizations, and it wants to make sure that the organizations and states and localities it provides its money to are not corrupted. So why would it care whether it is a public or a private organization, at least in the sense that it's not governmental? I mean, I can understand why the United States would not wish to intrude on the corrupt activities of governments apart from the FCPA. But when the government is putting billions of dollars into an organization, why doesn't it want to maintain it from corruption? Well, Your Honor, I think the reason that the government, the federal government, Congress would want to treat public international organizations potentially differently is because they do raise a host of diplomatic concerns that are separate and apart from every other application of 666 that I can think of. I also think it's important to recognize that the FCPA, by its definition of public international organization, is really capturing organizations that are maybe not 100 percent, but by and large are receiving federal funding, because they define them in terms of public international organizations that are either located here or the United States is a participating member. So I think really what you have here is the FCPA and its extension to international organizations is after Section 666 has been on the books for 14 years. So I think the really hard question to answer, and with respect, I think in the briefs the government doesn't even try, the really hard thing to answer is what did Congress think it was trying to accomplish in 1998 by extending the FCPA to public international organizations for the first time? Because those don't need to have any federal money. And yet we, as I said, as part of being good global citizens, are going to prevent domestic entities, which is the target group for the FCPA, from corrupting those entities. But again, if you look at the way that public international organization is defined in the FCPA, which is by reference to the International Organization Immunities Act, you are going to capture public international organizations that the United States is a member of, which is going to mean in essentially every situation that we're providing the funding. So I don't think it works to say that Section 666 maybe captures public international organizations that we fund and the FCPA captures everything else. It's almost a complete overlap. And what I think it shows is that when Congress focuses on an issue like extending liability to a public international organization and its officers, it understands there's sensitivities to that, there's diplomatic concerns about that, and so it did it in a very deliberate way, which was it has liability for the briber but not the bribee. And I think that doesn't eliminate all diplomatic friction, because if somebody else is convicted of bribing you as a UN official, that's certainly not going to reflect well on you. So I'm not suggesting there isn't any diplomatic sort of concerns in that, but I think there is lesser diplomatic concerns. And more to the point, Congress's judgment, which is, you know, maybe you would think up until 1998 that the FCPA is largely about sort of making U.S. entities behave well when they're abroad. But by extending it to public international organizations, defined in a way that they were going to capture lots of international organizations that have their headquarters in the United States, they were putting the statute in a different sphere, but they were still preserving that basic judgment that we're going to have liability for the bribee, or rather the briber but not the bribee. I see my time is up. I would just like to say one thing, though, if I could, about the FCPA, because I do think that the FCPA, we have a number of arguments in the brief, but the one I'd just like to focus on for a minute is I do think that the official acts instruction has to carry over to the FCPA in order to save it from all sorts of constitutional difficulties. Keep in mind that the McDonald case itself didn't involve a direct application of 201. The reason they had the official acts instruction in an honest services case is they said, well, this is bribery. In order to make that statute constitutional, we've limited it to bribery, so we're going to carry over 201 in its official act doctrine, because otherwise that doctrine sweep, that law would sweep way too broadly and would cover things like a letterhead, a letter on letterhead. And I think you have the exact same. I support the government's argument that that construction effectively wipes out the third part of the FCPA prohibitions about getting an unfair advantage. I mean, how does that even survive if we agree with you? It does survive in the following way. The first two subsections of the FCPA are written a little bit differently from 201, and so those two subsections actually don't capture a situation where I am bribing government official A to influence an act of government official B, because unlike other statutes like 201, this is written in terms of, the first subsection is basically written in terms of that officer taking an act, and then the second provision is that officer omitting a duty. So improper advantage I think could reach that situation where it's effectively I'm bribing officer A to get officer B to do something which otherwise would escape the statute and I think does qualify as an improper advantage. The alternative, just to be clear about it, would be to say, oh, well, what improper advantage gets you is advantages with respect to the very minor official acts, like sending a letter on letterhead or hosting an event at a presidential sort of gathering, and I just don't think there's any reason to think that what improper advantage gets you is that which would make the statute unconstitutional in my mind, but at least raise very serious constitutional doubts. I'm going to tax my colleagues' patience by asking you a number of questions following up on that. Let me assume, I know the government will not agree with this, that we accept your 666 argument and that we also accept your official act argument about the FCPA. Given that the jury was given an official act charge on Section 666, if we don't find that charge deficient, is the jury finding of an official act with respect to 666 basically defeat your argument that there's a problem on the FCPA because they would have found it? I would very much say that you cannot save an invalid count because you got an instruction on a count that covers the same basic territory. It says that it's harmless error not to give a charge if it's clear the jury would have found it anyway, and that's basically what I'm getting to here. Assuming the charge on 666 is not infected by error, do we basically have a neater situation on its application to the FCPA? I don't think that you do, and I think what I would say is even if you can do neater when you don't get something, I don't think you can short-circuit neater by looking at what the jury did on a count that should have never gone to the jury. And then I think if you just looked at the whole record here, I don't think you could find this harmless beyond a reasonable doubt. But also, and I know Your Honor knows this, I think we have an argument which I think is quite compelling that the official act instruction that was given here over our objection was critically deficient. I know that, and I also don't mean by the question to suggest either that I'm adopting any of the arguments I hypothesized or otherwise, but I have one more question. When we talk about official acts with an entity, do we have to look at what official acts that entity engages in? I ask this because having gone back to the beginning, which is the U.N. Charter, it seems the essence of official acts in the United Nations is reporting, recommending, studying, which is very different from what legislatures do. And so I do wonder whether some of what the Supreme Court has said had to be found when you were in the legislative context with official acts translates to the United Nations. So let me say two things in response to that, Your Honor. First of all, if you follow our whole argument, which basically says that 666 doesn't reach it and then the FCPA does, I think you would largely avoid this problem of what exactly does the U.N. do and what makes it an official act, because what you'd largely be focused on in those contexts of the FCPA's application would be procurement decisions. And in the procurement context, a case like Behel, there's no question in that context there's going to be an official act that awards the contract. And part of the reason there's not a clean official act here is because of the pro bono nature of this. There was never a moment where he was given an exclusive franchise because he was offering to do this for free. So that's one part of the answer. But the other part of the answer, Your Honor, I think is even if we sort of take the U.N. as a little bit we need to do a little bit of massaging here, I think you still have to look at, I mean, the U.N. and I think this is true, I think there's some case law that suggests, including from the circuit, that even when a legislature passes a resolution making, you know, tomorrow, you know, cheddar cheese day, that doesn't seem like the most substantive thing, but that is an official act. And so I think the U.N. does things like make, you know, declarations of the General Assembly and the like that are clearly official acts and would cover and would count as official acts. I think equally clearly, though, simply writing a letter on letterhead is not an official act, even in the context of the U.N., even if sort of at the end of the day what they do doesn't necessarily seem like it's that sort of substantive as opposed to symbolic. You still have things that are very much preliminary to that, and I just don't think it's enough to put it on official letterhead. And if you want to look at the closing arguments in this case, you will see that they were emphasizing time and time again, oh, this was an official letter. At one point they even say it was on letterhead. So they were clearly trying to tell the jury that they could essentially look at this and find a conviction based on the official letters, which don't count, and an official visit, which also doesn't count. So thank you, Your Honors. Thank you, Mr. Clement. You've reserved three minutes for rebuttal. May it please the Court, I'm Assistant United States Attorney Daniel Richenthal. I represented the government before the district court, and I represent the government on appeal. I'm going to start where Mr. Clement ended, and then I'm going to move back to the section 666 argument. So let me start where he ended, the arguments in summation to which he just referred. First of all, those weren't objected to. But the reason they weren't objected to is because they were entirely proper, entirely grounded in the record, and are not what he is saying. And I'm just going to refer to one in particular. Look, this was a five-week trial. There were hours of jury addresses, so it's hard to sort of encapsulate all of them. But I'm going to do my best with the same statement that he refers to. So we're talking about the same thing. So page 1344 of the joint appendix. This is during my colleague's summation before the jury. So what has the defendant gotten for its bribes? It's all right here. The U.N. document, UNOSSC letters, ashes of his visit to Macau, and pro bono agreement. Now, my adversary stops there. That's the entire quote in his reply brief. But my colleague didn't stop there. What she said next in the same paragraph was, at this point, the pathway was paved. Now, that may seem ambiguous to this panel. It was not to the jury. That phrase, pathway and path, that was our theme of trial from the opening statement through rebuttal. The whole way this case was tried was that Mr. Ng, who by no means was doing this for free, there's certainly no evidence in the record about that, but that's irrelevant, that Mr. Ng paid for years two senior officials of the United Nations to achieve an end. What end? Permanently moving an annual conference halfway around the world to his conference center. If that is not official action, nothing is. And it's not simply because that is a massive formal undertaking. It's because his principal co-conspirator, an American citizen, said, in materials we cite in our brief, that that would best be achieved through a general assembly resolution, which Mr. Clement rightly concedes must be official action. That alone defeats the McDonnell claim. And as Your Honor knows from our brief, the instruction here was plainly appropriate. It requires linguistic twists and turns to understand how Judge Broderick didn't instruct the jury in a court with McDonnell. But even if one were to engage in all of those linguistic twists and turns and conclude that it wasn't perfect, Judge Broderick did, and my adversary doesn't dispute this, tell the jury a letter of support isn't enough, a meeting isn't enough, it requires more. So the jury cannot have possibly found those things alone unless it literally ignored what it was told. There's no evidence to believe that it did that. Now, I also want to talk about the neater point, because I think it's relevant to this, and then again, as I said, I'll go to section 666. So first, the neater point. I'm not aware of any authority for the following proposition. We know beyond any doubt that if the jury had been properly instructed, assuming arguendo that my adversary is right, Mr. Ring would still be convicted. I don't think he even disputes that point fundamentally. Yet he deserves a new trial. Because, in my adversary's view, the instruction which was given should have been given several pages later than it was given. And that it was flawed. And that it was flawed. Now, again, we dispute that it was flawed, but assuming it's not flawed, that's a windfall the defendant's not entitled to. He's not entitled to a new trial when we know what the outcome would have been had he gotten what he says he deserves to have gotten. Neater is very clear on this point. I'm not aware of any authority that suggests to the contrary. Let me ask you this about the two statutes. When someone violates 666 by agreeing to do something to, you know, by paying money in order to have someone corruptly influence an agent of an organization, is the organization the U.N. or the country of which they were diplomats? The organization is the United Nations. And it has to be. That's what I understood, too. Yes. Under the FCPA, what are we dealing with? Is it in their capacity as a foreign official? Is this a foreign official of the U.N. or of the country that they were diplomats of? So it's a good question, and the answer is it could be either. The FCPA expressly defines foreign official. It's an odd term to use because of how it does it. The addition of the international organization. Exactly. An official can essentially wear two hats or wear one hat and then another hat. Can I ask this because my concern was, you know, can the official act, are we looking only at official acts of the U.N. as opposed to official acts of, that these people took in their capacities U.N. ambassadors? I'm not entirely sure I followed Your Honor's question, but let me try. Well, this question derives from the exchange between the two of you as to whether or not there was a duty and what the duty was. And so I understand U.N. ambassadors to have a duty to represent their individual countries and their countries' interests. I understand that to the extent Mr. Ash became the president of the General Assembly, you may be arguing that he has separate duties. But I'm trying to understand what duty and what official act are we focusing on here? So first let me start with what didn't happen, which is that the defense did not ask for an instruction that drew this distinction in any way, shape, or form. Period. It simply asked for an instruction that there was a misuse of official position, which literally tracks this Court's precedent word for word. But to go to Your Honor's question on the facts of this case, it actually sort of depends on the time period. And here's why. Mr. Ash was elected to the president of the General Assembly during the conspiracy. He then served in that position for roughly a year and then left the United Nations. Mr. Lorenzo was an ambassador for the entire period of the conspiracy, but he also was a special advisor to Mr. Ash. The evidence before the jury would indicate that essentially they were paid in all of these capacities. The jury was not asked to delineate between them. But I think the best way to understand how the case was tried, as opposed to what I think is an interesting legal question, it was tried as if the organization was the United Nations. And here's why I say that. The jury was given abundant evidence that what was really going on here was that Lorenzo and Ash were chosen in no small part because they were Lorenzo and Ash. That is, because Ash was the president of the General Assembly. The revised U.N. document, for example, which took place in June 2013, Mr. Ash was already known to be the president-elect or the president-elect-to-be of the General Assembly at that point. He took office a few months later. There was testimony that Mr. Lorenzo informed Mr. Ng of how important Ash would be. And then there was abundant evidence that that fact, that it was the president of the General Assembly, who a U.N. official at trial described as the second most powerful person in the entire United Nations system, excuse me, a former U.N. official, was essential to getting what Ng wanted, which was, among other things, a contract that is the alleged pro bono agreement. I say alleged because there's nothing pro bono about it, but it was a contract, and so on and so forth. So I think if you looked at sort of a trial, you know, what was the jury thinking to the extent you can divine that, I would say the U.N. was the organization, but the defense didn't ask for an instruction that went — But wait — It has to be, right? Because it has to be the organization that gets the U.S. money. Oh, absolutely. I'm sorry. I thought Your Honor was asking about the corrupt element. That is Mr. Clement's argument. Let me ask about that. Let me make that very clear. Because there was a request for an instruction on the term corruptly that would include an instruction with respect to the breach of a duty. You opposed that. Yes. And Judge Roderick didn't give it, notwithstanding Second Circuit authority that says that is part of acting corruptly, right? The Rooney case. Oh, yes. Absolutely. And so, I mean, why isn't that a problem? I mean, you said during the charge conference there's no basis to read a new element into the statute that Congress didn't put into the statute. But there was clear authority that corruptly means something more than what Judge Roderick instructed on and what's in sand, right? Actually, respectfully, no. So our view of Rooney, and the case is talking about Rooney, is that this court was talking about what it means to find corruption. That is the facts of Rooney itself were facts in which essentially the court held no reasonable jury could find the person acting corruptly because no reasonable jury could understand that any conceivable duty was violated. Not that a jury must find a duty. That's not in Rooney. That wasn't in Beheel. The instructions in Beheel, which were in the government's brief, which we cite in our brief, don't say that. This Court's decision in a case whose name is too long for me to attempt to pronounce, which is in our brief, literally says that corruptly in the FCPA means misuse of an official position. Judge Roderick instructed that word for word. The meaning of corruptly in the bank bribery statute and other statutes is generally understood to be evil or wrongful. The idea that the jury should be instructed in addition to finding that the defendant acted corruptly, that there must have been a duty, in our judgment, is not in the case law. But even if Judge Roderick should— There are certainly cases where instructions like the one requested by the defendant were given, right? The only— Where corruptly was defined to include the breach of a duty. The only case that I'm aware of is Ford, which the way it describes it is not akin to what the defense here was asking for. I'm not aware of another case that actually tells the jury to find a duty. But I also don't think it matters in this case for two reasons. First is the defendant here was the person paying the bribe, not receiving it. So the question is not did these ambassadors breach their duties, although they plainly did. The question— They breached their duties to whom? Well— Countries, to the United Nations, if the latter. What is the basis? Where does the duty come from? So both. Both the United Nations and their countries. But what I was going to say is the question is what did Mr. Ng intend for them to do? There's no question he intended for them to do that. If he had not intended for them to do that, a lot of the evidence in this trial makes no sense. For example, this letter to Ambassador Lorenzo pretending this is an arm's length transaction in which essentially a concerned citizen from China and an ambassador from the Dominican Republic agree on the merits of something, that was an utter charade. Lorenzo was being paid by Ng. He had met with him. He communicated with him and his assistant all the time. That letter is designed to hide what's going on. The fact that the letter from Weiping Zhao, the then-director of the United Nations Office for South-South Cooperation, which was critical to get the contract, was backdated, that it was backdated to make it appear it had been issued soon after the revised U.N. letter, the fact that the revised U.N. letter itself hid what was going on, asserted that the Sun-Kinip group somehow had been selected based on a recommendation of major countries named in the letter, that's false. It hadn't been selected by anyone except the people who were receiving bribes. So in our view, even if there had been an instruction to find a duty, the evidence that Ng intended to corrupt these ambassadors, and in fact did, although his intent alone would be good enough, was overwhelming. See, I think part of the concern is let's deal with the entity we've got, the United Nations. Your brief almost suggests that there was some obligation for these individuals to make disinterested decisions, which was affected by these payments. But we know that ambassadors to the U.N. don't have to make disinterested decisions. They represent their countries. They're going to speak for their country's interests. So if their country's view is, look, we're a poor country, don't do anything that hurts our interests, but otherwise we don't care what you do, lobby, take money, whatever, as long as you don't do anything contrary to our interests, we may not like it. It may not be what we would expect of our ambassador, but how is that corrupt? How is that corrupted now? First, there's no evidence whatsoever that the two countries at issue actually had that view, and there's certainly no evidence the United Nations has that view. The defense argument is that you didn't show what the scope of the duty was so as to be able to show how it was corrupted. So let me respond directly to that. I think I misunderstood Your Honor's question at least slightly. Ayan Bhatnaru, who is a former U.N. official who testified at trial, was himself a deputy foreign minister of the country of Moldova. He then was the permanent representative of the country of Moldova that is essentially its lead ambassador, and then he was a senior official at the U.N. So he had worn multiple of these hats. He testified at trial. It's actually quite lengthy testimony. And he explained in great detail the duties of ambassadors and then in particular the duties of the president of the General Assembly, how that person sets the agenda, how that person heads certain committees or puts people on committees to negotiate on his or her behalf. He described as the second most senior position in the entire U.N. whose duties essentially, my word not his, he didn't speak in terms of duties, he spoke in terms of obligations, in terms of procedures, in terms of rules, in terms of job description essentially, whose duties are to fundamentally represent the entire General Assembly, to advance the agenda for the session. These people only hold this job for one year. What is on that agenda is a big deal. And Ng knew this because Lorenzo told him that Ash was particularly important because he would be the president of the General Assembly. And that's exactly what he sought to abuse because what we refer to as the Verizon U.N. letter, it's not just a letter. It specifically asserts that the Secretary General, the senior most official in the entire United Nations, should track this item on an agenda. It actually uses the word agenda, which McDonnell also uses. And it asserts utterly falsely that it is actually in the interest of multiple countries who have all embraced this idea. Totally false. Our view is that the jury could have, on that alone, realized or inferred that Mr. Ng sought to corrupt both Ambassador Lorenzo and Ambassador Ash or President Ash. But there was so much more. There was the false statements that the money Lorenzo was for a loan when it wasn't. There was paying Mr. Ash's wife for a no-show job. And it's literally listed in the bookkeeping materials as wife of the President of the General Assembly. In other words, Ng himself understood who he was paying was the U.N.'s second most senior official. I think Your Honor asks a very good question, which is, well, he was also an ambassador. What does that mean? It wasn't raised at trial, and it doesn't matter because everything Ng sought was sought through the office of the President of the General Assembly and its advisor, Ash and Lorenzo. It's no accident. We argued this to the jury. It's no accident it was those two. It's no accident that he used the means in which he used. So I think I actually sincerely think these are interesting questions, but I don't think they have to be resolved for this appeal because the defense didn't seek an instruction that delineates this line. And it's very difficult on this record for me to conceive of a jury, having been told it had to do so, to not find that Ng intended to corrupt specifically the President of the General Assembly and his advisor. Now, I haven't mentioned Lorenzo's testimony, and I do want to mention it. And I see that I've gone over my time, but I'd like to continue on this for a moment. Lorenzo testified as a cooperating witness, and he said point blank when asked, was this consistent or inconsistent with your duties? He said inconsistent. It was plain as day that that's what had happened to you. The backdated letter, as I said, the lies to conceal what had happened, the fact that it was done through the office of the President of the General Assembly. Indeed, Wai Ping Tsao himself, in an e-mail to Jeff Yin, an American citizen who Ng used to commit this crime, said in so many words, it's in our brief, the contract is coming because it has the support of, not Ash, not the name, the President of the General Assembly, the PGA. That is what drove this whole case. And that's why I would say that even if there should have been an instruction that specifically delineated UN duty versus ambassadorial duty, it would matter not. Ng sought to corrupt both, but he principally focused on the UN. Now, I am out of time, but I would like to talk a little about Section 666, if it's okay with Your Honor. So I want to give an example of the kinds of organizations that are listed in 22 U.S.C. 288, the International Organizations Act. First of all, that Act actually uses the word organization, but I want to give an example to show how radical the argument advanced by my adversary is. Among the organizations listed there, it's not just the UN or things like the UN. It's the Great Lakes Fishery Commission. It's the Red Cross. It's the European Central Bank. It's the Global Fund to Fight AIDS. These organizations have little or nothing in common, other than they are in fact organizations, are in fact international, and have been recognized by the President of the United States to deserve immunity and privileges as set forth in that Act. Otherwise, they have nothing in common. What my adversary is essentially saying is notwithstanding that fact and notwithstanding that Congress used the word organization with no limitation of any kind, we should assume it categorically intended to exclude every single one of those organizations and every single one of its officers. There is no evidence whatsoever Congress so intended. Just the contrary. Its officers include, as in this very case, American citizens. Ambassador Lorenzo was an ambassador. He was an American citizen. Under my adversary's reading, he is categorically excluded from being prosecuted for bribery when he took those bribes in the United States with the assistance of another United States citizen, Jeff Yin, with the assistance of a lawful permanent resident, John Ash, to effect action in the United States. Comedy doesn't counsel in favor of categorically excluding most people. That's not comedy. That's giving up sovereignty. Comedy would work in the other direction. There's nothing in the statute or the principles behind it that warrant what my adversary is seeking. And moreover, specifically as to the U.N., as in Behel, Congress has repeatedly, for decades, evinced an interest in regulating U.N. funding, regulating U.N. procedures, regulating U.N. actions. Time and again it has done that. There's a list, I think on pages 27 or 28 of Behel, that lists just examples of this over and over and over again. And in this trial itself, we put in evidence that the U.N. receives in excess of $3.5 billion a year in federal funding. Thank you. Mr. Rickenbacker. That's nothing compared to what AIG gets from the mob. Thank you, Your Honor. Just a few points in rebuttal. First, I would urge you to look at the closing argument, just how much they focused on particular letters as being official acts in and of themselves. And I'll cite you to page JA-1399. And here's what it says. This is the rebuttal closing argument, one of the last things the jury heard. Quote, what was the defendant paying for? Documents, official documents from the United Nations, multiple official documents from the United Nations, at least two of which have that official logo on the upper right. I think the government's argument, at least as I understood it when I read it in the brief, was that all of these things that they were getting were toward a larger ultimate goal, which is the designation of the Macau facilities as a permanent convention center. So each document moved them a step further down that road, but the ultimate corrupt goal was getting the U.N. to make that its permanent convention site. Why isn't that plausible? That's not plausible because that is certainly not the only thing they argued to the jury. And they went out of their way to try to convince the jury that, yeah, they could convict if that was the ultimate official act and these were just steps on the way, but they also went out of their way to tell the jury that they could convict just based on these letters, just based on the official visit. But Judge Broderick didn't say that, right? The instruction said that wouldn't be enough. No, I don't think it does, and I want to get to that in a second on the instructional error. But just to your point, Judge Raji, on that same page of the joint appendix, right before they make this point about the documents, they're going through the chronology of what's happened and they talk about the letters, which I clearly don't think are enough, and then they say in the rebuttal argument, now I want to tell you something else. I could sit down now and you could convict the defendant of every single count. I'll sit down now. Not yet, but I could sit down now and you could convict the defendant of every count. They're trying to tell them, and they keep on telling the jury it's an official letter, it's an official visit. So they are clearly telling the jury that they could convict on that ground alone. Now, let's get to the instruction in Judge Sullivan's question, which could they do that under Judge Broderick's instruction? Absolutely yes, because by the time he's done taking out what I think is the critical language from McDonald, and our instruction is taken right from McDonald, he basically waters down the official act to the point where all it has to be is essentially something specific and focused on something pending. And I think based on that instruction, you could easily say that this letter was an official act. And if you take a step back, like, look, this is tough to get the official act instruction right, because the line that the Supreme Court is drawing in McDonald and Sundiamond is a little bit elusive. I mean, if you go back to – You can't say that it's a letter or a meeting by itself is not enough. Exactly. But that makes it more important to make it clear that if that's not in and of itself something, that the jury can't convict just on the letter, and they have to have the something else in mind, which has to be an official act. And it has to be – I'm not sure that's right. I mean, I think something more might show that a letter or a meeting is an official act in a particular context. I disagree with that. I mean, I think what they're saying is those are evidence of an effort to get something else. And, I mean, look, I don't want to overread it. Like, you could have a letter that says, you know, we hereby designate that, you know, you are the official vitamin supplement of Virginia, and that letter would be a decision or action of a formal matter. But the point I want to get at is I think what the court is looking for in McDonald is two things, and they have to marry up. One is an official act, and the other is a decision or action on the official act. And the first piece of that the court makes clear, and this goes back to Sundyman, it's not enough for it to just be official in the sense of like a letter on letterhead. It has to be something with a certain degree of materiality, and that's an elusive concept, and the way that the court at McDonald gets it across is to say, like a judicial determination, like an administrative determination, like a decision to have a hearing. We asked for that language, and we didn't get it from Judge Broderick. And I think without that language, it is very hard for a jury not to get misled, especially when the government is trying very hard to do it, to find that the letter itself is sufficient and it's the official act. And I really do think that Judge Broderick's instruction, although it just dropped a few words and transposed a few things, it took out the heart of that, which is you need both something that is an official act, like a judicial determination or administrative determination, and then decision or action on that. If I could just say one or two quick more things. On Rooney, I think you're absolutely right, and I think it's especially important in this context of the U.N., where no lay jury is going to have an inherent sense of what is a duty or not in the U.N. context. The final two points are I do think it would be entirely anomalous if this Court didn't extend the official act instruction to the FCPA, because if you think about what that would mean, it would mean that we have a more demanding test of bribery for foreign governments and for public international organizations than we do for our own officials in our own government. And I don't think there's any whiff that Congress, when it was taking the relatively unusual steps of extending an anti-bribery concept to foreign governments and public international organizations, wanted it to be more demanding than what we expect of our own government officials. But that's what you'd be doing if you said there's no official act instruction under the FCPA. And the last thing I would say is my friend on the other side talks about all these different organizations and what do they have in common. What they all have in common is, for one thing, they probably almost all take federal government funds, so it just shows that the overlap between 666 and the FCPA is almost 100 percent. But more importantly, as he acknowledges, they all were organizations that Congress and the executive branch wanted to give the same kind of immunities that sovereign states enjoy. That's what the IOIA does. It gives public international organizations the same kind of immunity that sovereign nations have. That's a big deal, and it shows these are not ordinary private organizations and that they should be treated differently. Thank you, Your Honors. Thank you. Thank you both. Of course, well-argued and helpful. We'll reserve decision.